[Cite as *In re D.K.*, 2009-Ohio-5438.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

IN THE MATTER OF:

D. K.,                                                        CASE NO.  1-09-16

ADJUDICATED DEPENDENT,
NEGLECTED and ABUSED CHILD,                   O P I N I O N

[KIM KNIEF, APPELLANT].

Appeal from Allen County Common Pleas Court,
Juvenile Division
Trial Court No. 2007 JG 24060

**Judgment Affirmed**

Date of Decision:   October 13, 2009

APPEARANCES:

*Michael J. Short* **for Appellant**

*Christina Steffan* **for Appellee, Allen Co. C.S.B.**

*F. Stephen Chamberlain*  **for Appellee Kuba**

*Mark A. Van Dyne,* **Guardian Ad Litem**

**PRESTON, P.J.**

{¶1} Defendant-appellant, Kim Knief (hereinafter "Knief"), appeals the judgment of the Allen County Court of Common Pleas, Juvenile Division, awarding the plaintiff-appellee, Allen County Children Services Board (hereinafter "ACCSB"), permanent custody of her child, (hereinafter "D.K."). For the reasons that follow, we affirm.

{¶2} In 2002, ACCSB filed complaints alleging that five of Knief's children, including D.K., were dependant, neglected, or abused. Ultimately, all five children were found to be dependant, neglected, or abused. Four of the children were eventually placed in the permanent custody of the ACCSB; however, D.K. was placed in the legal custody of his father, Keith Kuba (hereinafter "Kuba") in July 2005.

{¶3} In August 2007, ACCSB began an investigation against Kuba, which stemmed from allegations that his home was unsanitary and had no running water. Eventually, on September 18, 2007, ACCSB removed D.K. from his father's custody and assumed temporary custody of D.K.

{¶4} Knief filed a motion for legal custody of D.K. on March 31, 2008, and ACCSB filed a motion for permanent custody of D.K. on September 22, 2008. Hearings on these motions were simultaneously held on January 7 and January 23, 2009. Subsequently, on March 4, 2009, the trial court issued its judgment entry

denying Knief's motion for legal custody and granting ACCSB's motion for permanent custody.

{¶5} Knief now appeals and raises two assignments of error.

**ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED IN FINDING THE PRIOR INVOLUNTARY TERMINATION OF PARENTAL RIGHTS WARRANTED TERMINATION OF THE MOTHER'S PARENTAL RIGHTS IN THIS CASE.**

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED IN FINDING THAT THERE WAS CLEAR AND CONVINCING EVIDENCE THAT THE CHILD WAS ABANDONED.**

{¶6} Prior to addressing her assignments of error, we must first discuss the nature of this appeal. We note that the right to raise one's child is an "essential" and basic "civil right." *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169, citing *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551; *Meyer v. Nebraska* (1923), 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042. A parent who is a suitable person has a "paramount" right to the custody of their child. Id., citing *In re Perales* (1977), 52 Ohio St.2d 89, 97, 369 N.E.2d 1047; *Clark v. Bayer* (1877), 32 Ohio St. 299. As a result, "[p]arents have a 'fundamental liberty interest' in the care, custody, and management of their children," and when the State seeks permanent custody of the child, it must act in accordance with the due process guarantees provided in the U.S. and Ohio

Constitutions. *In re Shaeffer Children* (1993), 85 Ohio App.3d 683, 689-90, 621 N.E.2d 426, citing *Santosky v. Kramer* (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599.

{¶7} When considering a motion for permanent custody, the Ohio Revised Code sets out a two-prong test that a trial court must follow in its evaluation. *In re Franklin*, 3d Dist. Nos. 9-06-12, 9-06-13, 2006-Ohio-4841, ¶12. A trial court may grant permanent custody of a child to the agency if it determines, by clear and convincing evidence, that (1) one of the four factors listed in R.C. 2151.414(B)(1)(a)-(d) applies, and (2) that it is in the "best interest of the child." R.C. 2151.414(B)(1).

{¶8} In order to award permanent custody to an agency, the trial court must find one of the four factors listed in R.C. 2151.414(B)(1) exists; these include:

> **(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**
>
> **(b) The child is abandoned.**
>
> **(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.**
>
> **(d) The child has been in the temporary custody of one or more**

**public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.**

{¶9} Here, the trial court relied on R.C. 2151.414(B)(1)(a), that the child was not abandoned or has not been in the temporary custody of an agency for twelve or more months, but that the child could not be placed with either parent within a reasonable time. (Mar. 4, 2009 JE at 3-5). To determine whether a child cannot be placed with either parent within a reasonable time or should not be placed with either parent, in pertinent part, R.C. 2151.414(E) provides:

> **[T]he court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.535 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**
>
> **\* \* \***
>
> **(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**
>
> **\* \* \***
>
> **(10) The parent has abandoned the child.**
>
> **(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or 2151.415 of the Revised Code with respect to a sibling of the child.**

{¶10} Finally, to determine whether transferring permanent custody to the agency is in the 'best interests of the child,' R.C. 2151.414(D) provides a non-exclusive list of factors for the trial court to consider:

> **(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;**
>
> **(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**
>
> **(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

{¶11} A trial court must find that clear and convincing evidence exists as to each of the above two prongs when it grants permanent custody to the agency. *In re Smith*, 3d Dist. No. 9-04-35, 2005-Ohio-149, ¶36. Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *In re Smith*, 2005-Ohio-149, at ¶36, quoting *Cross v. Ledford*

(1954), 161 Ohio St. 469, 477, 120 N.E.2d 118 (citations omitted). Upon review, "when 'the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *In re Smith*, 2005-Ohio-149, at ¶36, quoting *Cross*, 161 Ohio St. at 477 (citations omitted).

*Assignment of Error No. I*

{¶12} In her first assignment of error, Knief argues that the trial court erred in finding that the prior involuntary termination of her parental rights with respect to her other children warranted the termination of her parental rights with respect to D.K. Knief acknowledges that at the time her case was heard the statute governing the termination of parental rights did permit the court to enter a finding that a child could not be placed with either parent within a reasonable time if the parent had had their parental rights previously terminated. However, Knief claims that this statutory provision has been recently amended effective April 7, 2009, and now requires an additional requirement in order to make that finding. Although, Knief admits that this amendment was not in effect at the time her case was heard, she still asks this Court to apply the new provision to this case because the provisions of Chapter 2151 should be liberally construed and the overall goal of Chapter 2151 is to keep families together.

{¶13} In addition to Knief's appellate brief, the guardian ad litem (hereinafter "GAL") for D.K., submitted a brief in support of Knief's position that the trial court erred in terminating her parental rights. With respect to her first assignment of error, the GAL claims that the recent amendment is not new law, but rather a codification of the law as it already existed; and thus, the trial court erred by solely relying on the events in Knief's past to justify its finding to terminate her parental rights with D.K. The GAL cites the proposition that "a prior adjudication of permanent custody does not result in a de facto determination of parental rights. To do so would amount to a violation of a parent's basic rights to raise their children." *In re Shaffer* (2000), 167 Ohio App.3d 141, 146-47, 854 N.E.2d 508. Thus, he contends that case law has always recognized a requirement that the elements of permanent custody be demonstrated to exist at the time of the filing of the motion for permanent custody.

{¶14} In determining whether an amended statute should apply to pending cases, the Ohio Supreme Court has stated:

> **The issue of whether a statute may constitutionally be applied retrospectively does not arise unless there has been a prior determination that the General Assembly specified that the statute so apply. Upon its face, R.C. 1.48 establishes a threshold analysis which must be utilized prior to inquiry under Section 28, Article II of the Ohio Constitution.**

*Van Fosse v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph one of the syllabus. R.C. 1.48 provides that a statute is to be applied in

a prospective manner unless expressly made retroactive. "If the statute does not clearly indicate retroactive application, the statute may only apply to cases arising subsequent to its enactment." *Nichols v. Villarreal* (1996), 113 Ohio App.3d 343, 348-49, 680 N.E.2d 1259.

{¶15} Here, the particular statutory section at issue is R.C. 2151.414(E)(11), which is one factor that can be considered for both the determination of whether the child can be placed with either parent within a reasonable period of time, and the determination of the best interest of the child. The original section stated:

> **(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**
>
> **(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or 2151.415 of the Revised Code with respect to a sibling of the child.**

The amendment to this section was effective April 7, 2009, amended by H.B. 7, and now reads:

> **(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections,** *and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.*

(emphasis added).

{¶16} While the amendment added an additional requirement to the finding that a parent has had their parental rights previously involuntarily terminated, the plain language of the amended statute does not indicate that the legislature intended retroactive application. As a result, we find Knief's arguments meritless and that the amended version of R.C. 2151.414, which became effective after the motion for permanent custody was filed, does not apply to the instant matter. *In re Weatherholt* (Feb. 4, 2000), 3d Dist. Nos. 13-99-31, 13-99-32, at *2. Thus, we review Knief's assignment of error under the statutory provision that was in existence at the time Knief filed her motion for legal custody and ACCSB filed its motion for permanent custody, which was the previous version, not the recent amended provision effective April 7, 2009. *A.S. v. D.G.*, 12th Dist. No. 2006-05-017, 2007-Ohio-1556, ¶20, citing *Snowberger v. Wesley*, 9th Dist. No. 22431, 2005-Ohio-3628, ¶13, fn.1; *In re Kennedy*, 1st Dist. No. C-060758, 2007-Ohio-548, ¶8.

**{¶17}** Besides the retroactive argument, Knief and the GAL argue that the effect of the older provision leads to the conclusion that the loss of custody of one child automatically leads to the loss of custody of all children. Essentially, they claim that we should find that a parent's prior termination of parental rights must not de facto cause their parental rights to be terminated in the future. We agree that a prior termination of parental rights should not result in a de facto termination of parental rights in the future; however, as we discussed above, a trial court must find that clear and convincing evidence exists as to *two prongs* when it grants permanent custody to the agency. The fact that a parent has lost parental rights with respect to other children is a factor that applies to both the determination of whether a child cannot be or should not be placed with either parent in a reasonable amount of time (R.C. 2151.414(E)(11)), and whether transferring permanent custody to the agency is in the best interest of the child (R.C. 2151.414(D)(5)). This Court has already stated that "with regard to the number of factors required to be found under R.C. 2151.414(E), * * * 'given the plain language of the statute, the trial court only needs to find *one* of the factors listed in (E) as to each parent before it 'shall' render a finding that a child cannot be placed with either parent.'" *In re Robinson*, 3d Dist. No. 1-08-24, 2008-Ohio-5311, ¶18, quoting *In re Matthews*, 3d Dist. Nos. 9-07-28, 9-07-29, 9-07-34, 2008-Ohio-276, ¶26 (emphasis in original). While the trial court need only find one of

the factors listed in (E) exist in order to render a finding that the child cannot or should not be placed with the parent, this finding does not automatically lead to the termination of parental rights. The trial court still must determine the "best interest of the child," which encompasses all of the factors listed in R.C. 2151.414(D).

{¶18} Furthermore, while we agree with the GAL that the case law is clear that there must be sufficient evidence as to each of the elements in order to terminate a parent's rights with their child, case law is also clear that the trial court need only find *one* of the factors in (E) as to each parent before it *must* render a finding that a child cannot be placed with either parent within a reasonable period of time. *In re Robinson*, 2008-Ohio-5311, at ¶18 (emphasis added). Here, the particular statutory provision in effect did not require anything but a prior termination of parental rights before the trial court was required to enter a finding that D.K. could not be placed with Knief within a reasonable period of time.

{¶19} Finally, not only does the application of the statute itself not result in a de facto termination of parental rights based on a parent's prior involuntarily terminated parental rights, here the trial court did not just rely on the fact that Knief had had her parental rights previously terminated with respect to her four other children; rather, it also found under R.C. 2151.414(E)(4) that Knief had demonstrated a lack of commitment towards the child by failing to regularly

support, visit, or communicate with the child when able to do so.  Specifically, in

its judgment entry, the trial court stated:

> **The Court further finds under division (E)(4) that the mother has demonstrated a lack of commitment toward the child by failing to regularly support, visit or communicate with the child when able to do so, particularly during that two-year period of time from August of 2005 to August of 2007.  She acknowledges that she had an order of visitation with the child during those years, but that she did not exercise the visitation.  She attributes this to the fact that she was "running around and drinking and all."  She also testified and provided supporting evidence to establish that she has been through counseling and gained insight into the poor decisions she made in the past.  The evidence does establish that she has over the past year demonstrated more of a commitment to assuming her parental responsibilities, but it is equally clear that in the years prior to that, she demonstrated an unwillingness to provide an adequate, permanent home for [D.K.] by continuing her relationships with inappropriate persons and by leaving the State and re-establishing herself elsewhere with an individual she now acknowledges to have been inappropriate for both herself and the child.**

(Mar. 4, 2009 JE at 5).  We note that Knief does not dispute the trial court's

findings with respect to (E)(4), which alone would have been sufficient to find that

the child could not or should not be placed with either parent within a reasonable

period of time.  *In re Robinson*, 2008-Ohio-5311, at ¶18, citing *In re Matthews*,

2008-Ohio-276, at ¶26.  Moreover, in its "best interest of the child" determination,

the trial court went through each of the enumerated division (D) factors.

Additionally, the trial court noted that there was also evidence to support an

(E)(11) finding:  that the parent had abandoned the child.  Thus, the fact that Knief

had previously had her parental rights terminated with respect to her other children did not automatically lead to the termination of her parental rights with respect to D.K.

{¶20} Finally, Knief and the GAL both mention in their briefs the great lengths Knief has gone through in an effort to gain legal custody over D.K., and they both claim that the record shows that now she can provide a stable residence for D.K. and can properly care for him. However, neither party disputes the fact that there was sufficient evidence to support the trial court's findings that D.K. could not be placed with Knief within a reasonable period of time because, under R.C. 2151.414(E)(11), Knief had previously had her parental rights terminated with respect to her four other children. Not only did the parties stipulate to the removal of her other four children at the hearing, but the State admitted into evidence the journal entries that had ultimately terminated Knief's parental rights with respect to her other four children. (Jan. 23, 2009 Tr. at 14-15); (State's Ex. E-H). Therefore, the trial court did not err in rendering its finding because there was sufficient evidence that D.K. could not be placed with Knief within a reasonable amount of time since she had had her parental rights involuntarily terminated with respect to four other children.

{¶21} Overall, we find Knief and the GAL's arguments meritless because: (1) the amended statutory provision does not apply retroactively to Knief's case,

(2) under the terms of the statute, the trial court was required to make a finding under R.C. 2151.414(B)(1) & (E) based solely on the prior involuntary termination of her parental rights, (3) there was sufficient evidence to support the trial court's finding that D.K. could not be placed with Knief within a reasonable amount of time, and (4) the trial court did not solely rely on the prior involuntary termination of Knief's parental rights in its decision to terminate her parental rights with respect to D.K.

{¶22} Knief's first assignment of error is, therefore, overruled.

*Assignment of Error No. II*

{¶23} In her second assignment of error, Knief and the GAL argue that the trial court erred in finding that she had abandoned D.K. They claim that there was evidence presented that she attempted to visit D.K. from August 2005 until August 2007, which rebutted the presumption under R.C. 2151.011(C) that she had the intent to relinquish all claims to D.K.

{¶24} With respect to reviewing a trial court's decision to terminate a person's parental rights, this Court has previously stated:

> **The decision of a trier of fact relating to a motion for permanent custody of children will not be overturned, so long as the record contains competent credible evidence from which the trial court could have formed a firm belief or conviction that the essential statutory elements have been established.** *In the Matter of Lawson/Reid Children* **(April 18, 1997), Clark App. No. 96-CA-0010. Furthermore, it must be noted that this Court must defer to "the trial court's findings of fact and rely on its ability to**

> **evaluate the credibility of the witnesses."** *State v. Anderson*
> **(1995), 100 Ohio App.3d 688, 691, 654 N.E.2d 1034.**

*In re Franklin*, 2006-Ohio-4841, at ¶21. Thus, we must determine whether the record contains competent, credible evidence from which the trial court could have formed a firm belief or conviction that the essential statutory elements were met. While we do not believe that there was sufficient evidence to support a finding for the exact amount of time the trial court stated, we do find that the trial court's general finding of abandonment was supported by sufficient evidence.

{¶25} Abandonment, prescribed under R.C. 2151.414(E)(10), is a factor that can be considered for both prongs of the termination of parental rights test: the determination of under R.C. 2151.414(B)(1); and the determination of the child's best interest. Abandonment has been defined as "any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." *In re Masters* (1956), 165 Ohio St. 503, 505-06, 137 N.E.2d 752. In addition, R.C. 2151.011(C) states that "[f]or the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." This statute creates a presumption of abandonment, which can then be rebutted by the parent. *In re Cravens*, 3d Dist. No. 4-03-48, 2004-Ohio-2356, ¶23.

**{¶26}** Regarding the issue of abandonment, Knief testified as follows:

Q. You ended up moving with him to Indiana. Is that correct?
A. Yes.
Q. And from approximately January to April, 2005, you had no contact with the kids because you were living with him in Indiana?
A. Yes, because of reasons that they had told me that I had lost all contact with the kids. I wasn't going to be allowed to be around them, so I was just trying to start a new life.
Q. Ma'am, you need to answer the questions I'm asking. It's true that you left from January to April, 2005. Is that correct?
A. Yes.
Q. During that time you were still entitled to visitation. Is that correct?
A. No. They had told me that everything was over with.
Q. When you came back in April, did you not visit with your children?
A. I had my last final visit. They said they had set it up.
Q. Was it the last final visit in August, 2005?
A. It took them awhile to get the last visit set up with the foster parents and everything else.
Q. So as far as…your testimony is that you were not allowed to have any visitations from January to April, 2005?
A. That's what I was told.
Q. Who told you that?
A. When I called up there at the services.
Q. Who did you speak with?
A. I could not remember. I mean that's three years ago.
Q. Isn't it true that you had visits with him [D.K.] in April and then left again in May until August, 2005?
A. Like I said, I don't remember. It's been three years, ma'am.
Q. Now once you lost permanent custody of the other kids, you still had rights to visitation with [D.K.]. Is that correct?
A. Yes.
Q. And you didn't regularly visit with [D.K.] until the agency got involved this time. Is that correct?
A. Yes, because I wasn't allowed.

\* \* \*

Q. And you stated that you went a year without seeing [D.K.] between Keith getting permanent custody and us getting…I'm sorry. Keith getting legal custody and us getting involved. Do you blame Keith for that?

A. Yes.

Q. But you didn't do anything to try to get your visits back, did you?

A. I tried communicating with Kim. She even tried to sneak him over to the…

Q. Hang on. I know who Kim is. I just want to make sure everybody else does. Who is Kim?

A. It's his girlfriend…Keith's girlfriend.

Q. Okay. Go ahead?

A. She tried to sneak him like over by the Save-A-Lot or something where I was living, and we would meet up; but that was all because she said he refused, and I found out…[D.K.] even told me this. He even turned around and told me, "Mom, I wasn't allowed to."

Q. But you didn't try to get any attorney, did you?

A. I tried and they couldn't…I couldn't find no attorney because I couldn't afford nothing.

\* \* \*

Q. Back when Mr. Kuba had legal custody of [D.K.], I believe you testified that you had court ordered visitation at that time?

A. Yes.

Q. So there was an order that you were supposed to have specific visitation?

A. I think it was supposed to be set up through Grampy's House.

Q. Were you exercising that visitation?

A. I was wanting to go up there, but he just never brought him up there. Grampy's House had noted a lot of times where I would try to get up there, but [D.K.] never showed up because he never brought him up there.

Q. So you were attempting to exercise your visitation?

A. Yes.

(Jan. 23, 2009 Tr. at 21-22, 32, 47).

{¶27} In addition to Knief's testimony, Lakenya Johnson, the caseworker who had supervised the initial visits between Knief and D.K. from May 2007 until June 2008, testified at the hearing. (Jan. 23, 2009 Tr. at 58). Johnson testified that she had witnessed a few of the visitations between D.K. and Knief, and as a result of her observations, she had concerns regarding Knief's parenting skills. (Id. at 66). Johnson said that even though Knief had not seen D.K. for about a year before the visits started, she believed that Knief allowed D.K. to do whatever he wanted to do and that she should have disciplined him when he needed it. (Id.).

{¶28} Moreover, Brent Bunke, the caseworker on D.K.'s prior case from September 2004 until D.K.'s placement with Kuba in August 2005, also testified to two extended periods of time when Knief had been absent from D.K.'s life. (Jan. 23, 2009 Tr. at 109-13). In particular, Bunke stated that despite having visitation rights, Knief failed to attend any of her visits with D.K. from January 2005 to March 2005, and from April 2005 to August 2005, because she had moved to Indiana with Jeff Mills, her boyfriend at that time. (Id. at 110-12). In fact, Bunke testified that Knief had approached him about her plans before she moved to Indiana:

**Q. In January of 2005, did Kim have a plan on moving?**

**A.   She did.   She came to me and expressed she was thinking about moving to Indiana.   Jeff had found some work over there, and she also thought she could get some work in there.**

**Q.   Did you have any conversation about how that would affect her case or her kids?**

**A.   We did on numerous occasions.**

**Q.   Okay.   What was her response to that?**

**A.   I just explained to her if she is in Indiana, it's going to be hard to have visits with her children since they're here in a foster home through the agency.   She explained they understood that.   She wasn't terribly happy about it, but just had made the choice that she felt, at that time, it was better for her to get on her feet, get a life started and went ahead and moved.**

**Q.   At any point, did the agency stop visitations with [D.K.] or any of her kids?**

**A.   The visitations continued after Kim left.   There was a point in time where we stopped having Keith send [D.K.] to the agency because there were no relatives…no parents for [D.K.] to visit with because Kim wasn't showing up for the visits because she had moved to Indiana.**

(Id. at 109-10).   Bunke further testified that Knief still retained her regular visitation rights with D.K. pursuant to a court order when Kuba was given legal custody, although Bunke had no knowledge as to whether she exercised her visitations rights because the agency was no longer involved.   (Id. at 112-13).

{¶29} Based on the above evidence, in its judgment entry, the trial court made the following finding of abandonment:

**Division (D)(5) also directs the Court in its determination regarding best interests to consider those factors set forth in Revised Code Section 2151.414(E)(7) to (11).   Of those, two have application to the mother.   First, as noted above, she has had parental rights involuntarily terminated with respect to four siblings of the child (Revised Code Section 2151.414(E)(11)).   Additionally, the Court finds under Revised Code Section**

-20-

> **2151.414(E)(10) that the mother has abandoned the child. Revised Code Section 2151.011(C) provides as follows:**
>
> **For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days.**
>
> **Again, the mother acknowledges that she failed to visit or maintain contact with the child for a period of two years from August, 2005 until August, 2007, well beyond the ninety days contemplated in the statute.**

(Mar. 4, 2009 JE at 7).

{¶30} Knief and the GAL claim that there was little testimony regarding the issue of abandonment. While we do not believe there was sufficient evidence to support the finding that Knief had abandoned D.K. for over two years, it is clear to this Court that there were several periods of time in which Knief had failed to have contact with D.K. for at least the statutorily required ninety days, which would have created a presumption of abandonment. Knief admitted that during the two-year period of time she had court ordered visitation rights with D.K. In addition, Bunke and Knief's testimony both demonstrate that at least between January 2005 to March 2005, and from April 2005 to August 2005, Knief failed to attend any of her visitations with D.K. because she had moved to Indiana to "get a life started." We believe this testimony was sufficient to raise the presumption that Knief had abandoned her child.

**{¶31}** If a presumption of abandonment was raised, Knief then argues that she presented enough evidence to rebut the presumption. There was testimony from Knief that during the period of alleged abandonment, even though she had visitation rights with D.K., she thought that she was not allowed to visit. In addition, once Kuba received legal custody of D.K., Knief testified that she had attempted to exercise her visitation rights and even had Kuba's girlfriend try to sneak D.K. over to another location so Knief could visit him.

**{¶32}** The trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony, thus we must give deference to the trial court's findings of fact. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. Based on this deference, we do not believe there is evidence that would have rebutted the presumption that Knief had abandoned D.K. First of all, Knief failed to provide any evidence with respect to the two periods of time in 2005 when she moved to Indiana. Even though Knief testified that she believed she was not allowed to visit, her caseworker at the time stated that he had talked with her a number of times about how her move to Indiana would effect her visitations with her children. He even said that she was aware of the consequences, yet she still chose to move because "it was better for her to get on her feet, get a life started." In addition, besides trying to have Kuba's girlfriend

sneak D.K. over to a secret location, there is no evidence in the record that Knief took any kind of affirmative action to enforce her legal right to visitations with D.K., even after Kuba was given legal custody of D.K.

{¶33} Knief and the GAL also argue that since returning to the child's life, she has been regularly attending visitation with D.K., and that she has never missed any of the visits. However, R.C. 2151.011(C) clearly indicates that it is immaterial whether the parent resumes contact with the child after the period of abandonment. *In re D.P.*, 10th Dist. No. 06AP-780, 2007-Ohio-1703, ¶7, citing *In re Cravens*, 2004-Ohio-2356, at ¶23 (no rebuttal of presumption of abandonment when father visited daughter after period of abandonment). Thus, even though Knief eventually demonstrated her commitment to D.K. by regularly attending her recent schedule of visitation and accomplishing her case plan's goals, under the terms of the statute her subsequent actions do not rebut the presumption that she had abandoned D.K.

{¶34} We also note that while Knief disputes the particular finding of abandonment, she does not dispute any of the other findings that the trial court made in its judgment entry. In addition to the abandonment finding, and with respect to the overall determination of the child's best interest, the trial court stated:

> **The Court having found as to both parents that, by definition, the child cannot be placed with either parent within a reasonable**

**period of time or should not be placed with either parent, the Court must then turn to whether or not an award of permanent custody is in the child's best interest. For that determination, the Court must look to Revised Code Section 2151.414(D). Under that section, the Court is to consider "all relevant factors" including five specifically delineated factors. As to sub-section (1) of that division, \* \* \* [t]he interaction and interrelationship of the child with the mother has been extremely limited since 2005 and non-existent from August of 2005 until August of 2007. The child has had no interaction or interrelationship with any of his siblings or other relatives since August of 2005. The evidence establishes that [D.K.] has a very positive interaction and interrelationship with his foster caregivers and other children in their home (Revised Code Section 2151.414(D)(1). The Guardian Ad Litem reports in his Report and Recommendation that [D.K.] "loves his mother and sincerely desires to reside with her." (Revised Code Section 2151.414(D)(2)). With respect to the child's custodial history, the record indicates that he resided with his mother from his birth in 2001 until his removal in 2003, was then in foster care until placement with the father in August of 2005, was with the father until August of 2007, and again in foster case since removal at that time. He has therefore not been in custody of the mother for nearly five years (Revised Code Section 2151.414(D)(3)), and had no contact with her for two of those five years. Given that history, [D.K.] is in critical need of a legally secure permanent placement and the Court concludes that such placement cannot be achieved without a grant of permanent custody to the agency (Revised Code Section 2151.414(D)(4)).**

**\* \* \***

**The mother's more recent interest in her child and changes in her life are commendable. She does appear to have taken steps to break from her former unstable lifestyle. The current agency caseworker observed nothing in the mother's home to suggest that the child would presently be at risk there. However, the issue before the Court is not whether the mother has made commendable changes in her life. Once one of the factors listed in Revised Code Section 2151.414(E) is established, the question**

**is strictly that of that which is in the child's best interest. Based on those factors set forth in Revised Code Section 2151.414, the Court concludes that [D.K.'s] best interests will be served by a grant of permanent custody to the Allen County Children Services Board and termination of parental rights.**

(Mar. 4, 2009 JE at 6-8). Knief does not dispute any of the additional findings made by the trial court. Therefore, even if the trial court's finding under R.C. 2151.414(E)(10) was in error, we believe that the other findings were certainly sufficient to support the trial court's permanent custody decision. *In re J.E.*, 9th Dist. No. 23865, 2008-Ohio-412, ¶15 (finding that even if the trial court's finding under R.C. 2151.414(E)(2) was in error, the undisputed alternate finding under R.C. 2151.414(E)(11) was sufficient to support the trial court's permanent custody decision).

{¶35} Knief's second assignment of error is, therefore, overruled.

{¶36} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS and SHAW, J.J., concur.**

**/jlr**