[Cite as *In re J.D.*, 2011-Ohio-1458.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

**IN THE MATTER OF:**

**J. D.,**                                                                 **CASE NO.  5-10-34**

**ALLEGED ABUSED, NEGLECTED
AND DEPENDENT CHILD,**

                                                                              **O P I N I O N**

    **[AMANDA CONTRERAS
-   APPELLANT].**

**Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 20930010**

**Judgment Affirmed**

**Date of Decision:   March 28, 2011**

**APPEARANCES:**

    *Nicole M. Winget*  **for Appellant**

    *Mark C. Miller and Benjamin Hall*  **for Appellee**

**SHAW, J.**

{¶1} Mother-appellant, Amanda Contreras ("Amanda"), appeals the October 1, 2010 judgment of the Common Pleas Court, Juvenile Division, of Hancock County, Ohio, granting permanent custody of her child, J.D., to Hancock County Job and Family Services-Children's Protective Services Unit ("the Agency").

{¶2} The facts relevant to this appeal are as follows. J.D. was born addicted to heroin and other opiates in January of 2009. When confronted about J.D.'s positive test results for opiates five days after he was born, Amanda admitted to using a number of drugs during the first five months of her pregnancy but later admitted to using them during the first six months of pregnancy. Eventually, Amanda acknowledged to the Agency that she used a drug called Dilaudid, an opiate, approximately 1-1½ weeks before giving birth. According to medical personnel, J.D.'s withdrawal was consistent with significant exposure to opiates throughout the pregnancy, and Contreras later admitted to using opiates a few days prior to delivering J.D. As a result of his addiction, J.D. had to be weaned from the drugs, which took a significant amount of time because it had to be done gradually due to the risk of death associated with withdrawal in infants.

{¶3} On February 19, 2009, the Agency filed an ex parte request for emergency temporary custody of J.D. upon his release from the hospital, and the

trial court granted the Agency's request. The following day, a hearing was held on the request for emergency temporary custody. J.D.'s parents were present and represented by counsel at this hearing. The trial court granted emergency temporary custody of J.D. to the Agency. The Agency filed a complaint in the trial court that same day, alleging that J.D. was neglected, abused, and dependent.

{¶4} J.D. was released from the hospital on March 10, 2009, and placed into foster care. On May 1, 2009, the adjudicatory hearing was conducted. At that time, the parents admitted that J.D. was neglected, abused, and dependent, and the trial court adjudicated him as such. The parties agreed to proceed to disposition and also agreed that the disposition would be for J.D. to be placed into the legal custody of his maternal uncle and aunt, Aaron and Jennifer Contreras, but under the protective supervision of the Agency.

{¶5} J.D. remained with his aunt and uncle throughout most of the summer. However, on July 30, 2009, the Agency requested, ex parte, to change J.D.'s disposition from legal custody with his aunt and uncle to that of temporary custody with the Agency. The reason for this change was based upon a request from the aunt and uncle that the Agency resume custody of J.D. because they had J.D.'s nine-year-old sibling living with them and had four young children of their own, one of them a newborn, making it very difficult for them to care for J.D.,

who was only six-months-old at the time.[1] At the time, the Agency notified the trial court that J.D.'s father had last informed the caseworker that he planned to move to Florida but that it had no current address or phone number for him. In addition, Amanda last informed the caseworker that she was homeless, living in Toledo, Ohio, and was planning to surrender to law enforcement as there was a warrant for her arrest but had not done so, and the caseworker had no current contact information for Amanda. On August 6, 2009, the trial court held a hearing on the matter and granted temporary custody of J.D. to the Agency. J.D. was then placed back into foster care. J.D. remained in the same foster home from August of 2009 until March of 2010. At that time, the foster family moved to another State, and J.D. was placed with different foster parents, where he remains.

{¶6} From May of 2009 until March of 2010, the Agency was unaware of Amanda's whereabouts, and she had no contact with J.D. However, in March of 2010, Amanda was located in West Virginia. The Agency learned that she had given birth to another child, B.D., in January of 2010, and that this infant was severely injured by his father, who is also J.D.'s biological father. When Amanda took B.D. to the hospital for his injuries, she gave a false name for herself. After discovering the nature of B.D.'s injuries, which included several broken ribs and a

---

[1] According to the record, the aunt and uncle did not request that J.D.'s sibling be removed because of her relationship with them, her desire to remain with them, and her age, which meant that she did not require the level of care and attention that a baby requires.

skull fracture, Amanda left the hospital with B.D. However, she returned to the hospital a short while later after speaking with her mother.

{¶7} The police were summoned and Amanda was questioned about B.D.'s injuries. She continued to use the false name she provided to the hospital and told the investigator that she had met a man on the internet, was staying in a hotel with him, and left the baby alone with this man while she showered but that she had no idea how the injuries occurred. Amanda's mother was also at the hospital and provided the same story.

{¶8} Approximately five to six hours later, Amanda's mother asked to speak with a pastor. After speaking with the pastor, Amanda's mother told the investigator that her daughter was lying, that Amanda lived with her husband (J.D.'s and B.D.'s father), that they had two children in the custody of the State of Ohio, that Amanda had some unresolved legal issues in Ohio, and that her real name was Amanda Duran.[2] Amanda's mother also told the investigator that B.D.'s father had a drinking problem and a temper and she suspected that he caused B.D.'s injuries. B.D.'s and J.D.'s father was later indicted on charges stemming from the abuse of B.D., pled guilty, and was awaiting sentencing of anywhere from four to twenty years in prison. Amanda was not charged with any offense relating to the abuse suffered by B.D.

---

[2] At some point during the pendency of this action, Amanda married J.D.'s father and took his last name. However, the filings in this case refer to her by her maiden name of Contreras.

{¶9} On March 24, 2010, Amanda was arrested in West Virginia after the authorities discovered there was a warrant from Ohio for her arrest. Amanda was then transported back to Hancock County, Ohio. On April 22, 2010, the Hancock County Common Pleas Court found that Amanda had violated the terms of her community control that she was placed under in January of 2009, in two cases: one case consisted of two convictions for trafficking in heroin, one a felony of the third degree and the other a felony of the fourth degree; and the second case was a conviction for forgery, a felony of the fifth degree. As a result of these violations, Amanda was given an aggregate sentence of three years and eleven months in prison with jail-time-credit for seventy-four days.

{¶10} On June 28, 2010, the Agency filed a motion for permanent custody of J.D. On August 25, 2010, Amanda's court-appointed counsel filed a motion to withdraw as her counsel due to health issues he was experiencing. This motion was granted, and new counsel was appointed to represent Amanda on August 30, 2010. On September 9, 2010, new counsel requested that the permanent custody hearing scheduled for the end of that month be continued. This request was denied on September 13, 2010.

{¶11} The permanent custody hearing was held on September 28-29, 2010. On October 1, 2010, the trial court granted permanent custody of J.D. to the

Case No. 5-10-34

Agency and terminated Amanda's and J.D.'s father's parental rights.[3]   Amanda

now appeals and asserts four assignments of error for our review.

### FIRST ASSIGNMENT OF ERROR

**THE JUDGMENT OF THE TRIAL COURT TO GRANT HANCOCK COUNTY JOB AND FAMILY SERVICES PERMANENT CUSTODY WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.**

### SECOND ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY FOR THE CHILD BECAUSE IT WAS NOT IN HIS BEST INTEREST.**

### THIRD ASSIGNMENT OF ERROR

**THE HANCOCK COUNTY JOB AND FAMILY SERVICES FAILED ITS DUTY TO USE REASONABLE CASE PLANNING AND DILIGENT EFFORTS AND REUNIFICATION WITH THE PARENT.**

### FOURTH ASSIGNMENT OF ERROR

**THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING THE APPELLANT'S REQUEST FOR CONTINUANCE DUE TO RECENTLY APPOINTED NEW COUNSEL.**

{¶12} For ease of discussion, we elect to address the assignments of error

out of the order in which they appear and to address the first and second

assignments of error, which are interrelated, together.

---

[3] J.D.'s father was not present for this hearing because he was in custody awaiting sentencing in West Virginia.  However, his court-appointed attorney was present and participated in the hearing.  The father did not appeal the trial court's grant of permanent custody.

*Third Assignment of Error*

**{¶13}** In her third assignment of error, Amanda asserts that the trial court erred in finding that the Agency made reasonable efforts to return her child to her. More specifically, Amanda contends that the Agency failed to follow up on the treatment or services that Amanda was receiving while incarcerated, thereby failing in its duty to use reasonable case planning and diligent efforts towards reunification.

**{¶14}** The Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419; see, also, *In re Brown* (1994), 98 Ohio App.3d 337, 344, 648 N.E.2d 576. Further, the agency bears the burden of showing that it made reasonable efforts. R.C. 2151.419(A)(1). "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans*, 3rd Dist. No. 1-01-75, 2001-Ohio-2302. To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *Id.* Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan. *Id.* "Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and

diligent under the circumstances of this case." *In re Leveck*, 3rd Dist. Nos. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶ 10.

{¶15} In the case sub judice, the Agency was awarded temporary custody of J.D. because he was born addicted to three opiates due to his mother's drug usage throughout her pregnancy. In March of 2009, a case plan was developed and the trial court adopted this plan. Among the concerns identified in this plan was Amanda's need for a drug and alcohol abuse assessment at Century Health and to follow all recommendations including attending individual counseling, educational groups, support groups, and to complete the Life Skills program.[4] The Agency was to provide Amanda with the necessary referrals, transportation if needed, and to assist with payment for these services. The case plan also identified a concern that Amanda needed parenting education. As such, the plan required Amanda to participate in parent education and to follow all recommendations made by the parent educator. Once again, the Agency was to provide the necessary referral. In addition, the Agency was to obtain service provider reports and to make regular home visits to discuss parent education with Amanda.

---

[4] The case plan also identified similar concerns regarding J.D.'s father. However, as previously noted, J.D.'s father did not appeal the grant of permanent custody; thus, we will not discuss the case plan as it pertains to him.

{¶16} A new case plan was filed on August 17, 2009, shortly after J.D. was removed from the care of his aunt and uncle and returned to foster care. This plan noted that J.D.'s parents were no longer in the area and had not been participating in the case plan. It also noted that Amanda was running from law enforcement because of a warrant issued for her arrest from Hancock County in May of 2009. In addition to the concerns previously identified, the case plan also identified J.D.'s need for safe and stable housing. The plan required Amanda to notify the Agency of any change of address and to report the name of any person staying overnight or living in the home. In turn, the Agency was to make regular home visits, make any necessary housing referrals, and to monitor the home's safety. The trial court adopted this plan on September 2, 2009.

{¶17} At the beginning of the permanent custody hearing, the parties stipulated that the case plan was reasonably calculated to correct the reasons that J.D. was removed. Megan Lauck, the assigned caseworker, testified that she discussed the original case plan with Amanda in March and in April of 2009, and that Amanda indicated she understood it. Lauck further testified that Amanda was assessed by Century Health and was to attend substance abuse groups and individual counseling. According to Lauck, Amanda did attend some appointments with Century Health but left the State of Ohio in May of 2009, and never returned to Century Health. Lauck also testified that Amanda completed a

parent education class in February of 2009, but that Lauck did not have the opportunity to witness whether Amanda could implement anything that she learned from this class because she left Ohio and never visited with J.D. after May of 2009. Lauck testified that the only portions of the case plan that Amanda completed were attending a parent education class, having her substance abuse assessment, and attending some counseling sessions at Century Health. However, she did not complete the counseling at Century Health.

{¶18} Although the parties stipulated that the case plan was reasonably calculated to correct the reasons for J.D.'s removal, Amanda asserts that the Agency failed to make diligent efforts to reunify J.D. with Amanda when it did not follow up with Amanda's utilization of the Tapestry program while in prison. Amanda bases this assertion on the following testimony. In June of 2010, while in prison, Amanda told Lauck that she was going to attend the Tapestry program in prison, which helps inmates with substance abuse issues. On cross-examination, Lauck testified that she did not look into the Tapestry program while visiting Amanda because the prison had very strict rules regarding visitation and she was not permitted to speak with any staff members at that time. Amanda later testified that she was participating in the Tapestry program and explained how the program helps offenders who suffer from addictions. In light of this testimony, Amanda contends that Lauck should have reviewed the treatment and services Amanda was

receiving so that she could give accurate testimony on Amanda's progress and could accurately develop and maintain a case plan aimed at reunification. We find these contentions without merit.

{¶19} The case plan was clearly designed to help Amanda with her substance abuse issues, and the evidence demonstrated that Lauck followed through with the responsibilities of the Agency that were outlined in that plan. Amanda is the one who chose not to attend all of her counseling sessions at Century Health. Amanda is also the one who chose not to appear in criminal court, which resulted in a warrant for her arrest, to leave the State of Ohio, to lie to her caseworker regarding her whereabouts, to not have any contact with J.D. at any point after May 20, 2009, and to make no attempt to contact the caseworker to determine her child's well-being even after her husband, with whom she was living, visited J.D. and was aware that J.D. was no longer in the care of family members. Further, Amanda did not begin the Tapestry program until sometime in May or June after she was imprisoned at the Ohio Reformatory for Women, over a year after she stopped visiting J.D., and she did not provide any evidence to corroborate her testimony regarding the treatment she was receiving or that would show her progress, if any, while in prison.

{¶20} In short, the Agency's failure to look into the Tapestry program and Amanda's progress therein did not amount to a failure to facilitate the

reunification of this family. Rather, the Agency was severely hampered in its ability to reunify this family because Amanda left the area and provided the Agency with no way of contacting her, let alone assisting her to remedy the conditions that led to J.D.'s initial removal and continued removal. Under these circumstances, the trial court did not err in determining that the Agency's case planning and efforts in this case were reasonable and diligent, and the third assignment of error is overruled.

*First and Second Assignments of Error*

{¶21} In her first assignment of error, Amanda contends that the trial court's decision to grant permanent custody of J.D. to the Agency was against the manifest weight of the evidence because the evidence showed that she made several steps towards remedying the condition that was the cause of J.D.'s removal from her care, i.e. her substance abuse. In her second assignment of error, Amanda asserts that the trial court erred in finding that permanent custody was in J.D.'s best interest.

{¶22} As an initial matter, we note that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Franklin*, 3rd Dist. Nos. 9-06-12, 9-06-13, 2006-Ohio-4841, citing *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680. The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows."

*In re Hayes*, supra, quoting *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45. Thus, it is with these constructs in mind that we proceed to determine whether the trial court erred in granting permanent custody of the children to the Agency.

{¶23} Section 2151.414 of the Revised Code provides, inter alia, that a trial court

> **may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that** *any of the following apply***:**
>
> **(a)   The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, \* \* \* and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**
>
> **(b)     The child is abandoned.**
>
> **\* \* \***

R.C. 2151.414(B)(1)(a-b) (emphasis added).  The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established."  *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 120 N.E.2d 118. Further, "[i]t is intermediate; being more than a mere

preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id.*, citing *Merrick v. Ditzler* (1915), 91 Ohio St. 256, 110 N.E. 493. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross*, supra (citations omitted); see, also, *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 481 N.E.2d 613.

{¶24} In regards to making a finding pursuant to R.C. 2151.414(B)(1)(a), the Revised Code states as follows:

> **(E)  In determining at a hearing held pursuant to division (A) of this section \* \* \* whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence.  If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section \* \* \* that *one or more of the following exist* as to each of the child's parents, the court *shall* enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**
>
> **(1)  Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court**

-15-

**shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**\* \* \***

**(10) The parent has abandoned the child.**

**\* \* \***

**(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.**

**\* \* \***

**(16) Any other factor the court considers relevant.**

R.C. 2151.414(E) (emphasis added).

{¶25} Here, the trial court found that that J.D. could not be placed with either parent within a reasonable period of time or should not be placed with the parents. Amanda asserts that in doing so, the court relied heavily on the parents' failure to remedy the conditions causing J.D. to be removed from her care but that such a finding was against the manifest weight of the evidence. In support of her position, Amanda states that J.D. was removed from her care because her abuse of drugs caused him to be born addicted to those drugs and that her testimony revealed that she has done everything to conquer her addiction. More specifically,

Amanda testified that she enrolled herself in treatment in West Virginia prior to being incarcerated, that she has not abused drugs in several months, and that she is currently involved in the Tapestry program in prison, which is a program to help inmates who have substance abuse issues.

{¶26} As previously noted, J.D. was placed into the temporary custody of the Agency because he was born addicted to opiates due to Amanda's extensive drug use while pregnant with J.D. In order to help remedy this situation, the case plan required Amanda to follow any recommendations made by Century Health for treatment. The case plan also permitted Amanda to visit J.D. twice a week for two hours each time, supervised, which would allow the two to bond with one another. Lauck testified that she discussed the case plan with Amanda during home visits with her in March and April of 2009, and that Amanda indicated she understood the plan. According to Lauck, Amanda attended some counseling sessions at Century Health, but by May of 2009, she had stopped attending. During this time, she also visited J.D. seventeen times, although she had twenty-four visits available to her. The last time Amanda ever visited with J.D. was on May 20, 2009, when he was less than four months old.

{¶27} Robin Brown, a mental health substance abuse counselor at Century Health, testified that Amanda received an assessment at Century Health on November 6, 2008, and was diagnosed as opiate dependent. Based on this

diagnosis and pursuant to the terms of her community control stemming from her felony convictions, as well as the case plan of the Agency that was later established, she entered into treatment at Century Health. This treatment required that she attend individualized counseling and two group treatments per week. Brown testified that from November of 2008 until the time of Amanda's discharge from services due to non-compliance on May 20, 2009, she had attended only twenty-three of her fifty-nine scheduled appointments with the last appointment she actually attended being April 2, 2009.

{¶28} In May of 2009, Amanda informed Lauck that she was living in Toledo and was in the Compass House, an in-patient substance abuse treatment center. However, Amanda did not provide Lauck with any contact information or proof of her treatment at Compass House, and Lauck did not have a medical release form from Amanda to obtain access to Compass House records. According to Amanda's supervising officer, Joe Schroeder, Amanda was scheduled to be in court in Hancock County on May 28, 2009, for a community control revocation hearing based upon a drug screen of her that showed she was positive for opiates. Lauck went to court that day to speak with Amanda, but Amanda did not appear for court. As a result of her failure to appear, a bench warrant for her arrest was issued. After this time, Amanda's whereabouts were unknown to the Agency and to her supervising officer until her arrest in West

-18-

Virginia on March 24, 2010, ten months later. Lauck testified that Amanda called her twice during the summer of 2009, and told her that she was homeless and living in Toledo. She also told her that she had terminated her pregnancy[5] and had a new boyfriend. After Amanda was arrested and transported back to Ohio, Lauck visited with her on four occasions and discussed the case plan with her again. By this time, the plan had been amended to include J.D.'s need for a safe and stable living environment.

{¶29} Amanda also testified at the permanent custody hearing. During her testimony, she did not dispute any of the testimony of Lauck, Schroeder, or Brown. Amanda testified that she left Compass House before completing treatment because she discovered there was a warrant for her arrest. She testified that she and J.D.'s father decided to leave Ohio and move to West Virginia in an effort to quit using drugs. According to Amanda, she started going to a methadone clinic and attended counseling. She also testified that she no longer used drugs and was currently participating in the Tapestry program in prison. She explained that this program involves behavior modification to enable inmates to stop using drugs.

{¶30} The trial court, as the trier of facts, has the discretion to determine what evidence it finds credible and not credible. Here, the court relied on the

---

[5] The baby that Amanda told Lauck she aborted was actually B.D., who was born approximately seven months after Amanda told Lauck she had aborted him.

undisputed evidence that Amanda did not comply with the case plan's requirement that she follow through with substance abuse services with Century Health in order for it to determine that she did not substantially remedy the conditions causing J.D. to be removed from the home. The court specifically noted that it considered Amanda's utilization of social and rehabilitative services and material resources that were made available to her with the purpose of changing her conduct to allow her to assume and maintain her parental duties. Other than her testimony, Amanda presented no evidence of her participation and/or progress in the Compass House, the methadone clinic (including even the name of this clinic), or the Tapestry program. Given Amanda's undisputed history of fabrication, the trial court was certainly free to disregard Amanda's uncorroborated testimony. Thus, we cannot conclude that the trial court's finding as to R.C. 2151.414(E)(1) was against the manifest weight of the evidence.

{¶31} Furthermore, even assuming arguendo that the R.C. 2151.414(E)(1) finding was against the manifest weight of the evidence, the Revised Code requires a trial court to enter a finding that the child cannot or should not be placed with his parents within a reasonable time if it finds that *any one of factors* in R.C. 2151.414(E) are present. In addition to its finding under R.C. 2151.414(E)(1), the trial court found that J.D. was abandoned.

**{¶32}** Abandonment is a factor that can be considered for both prongs of the termination of parental rights test: the determination under R.C. 2151.414(B)(1)(a) or (b) and the determination of the child's best interest. See *In re D.K.*, 3rd Dist. No. 1-09-16, 2009-Ohio-5438, ¶ 25. The Revised Code states that "[f]or the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C). "This statute creates a presumption of abandonment, which can then be rebutted by the parent." *Id.*, citing *In re Cravens*, 3rd Dist. No. 4-03-48, 2004-Ohio-2356, ¶ 23.

**{¶33}** The record reveals that at the beginning of the permanent custody hearing both parents *stipulated* that J.D. was abandoned. Although they entered this stipulation with the caveat that they were making the stipulation because they were both incarcerated, they, nevertheless, agreed that J.D. was abandoned. Further, the trial court found, and the undisputed evidence revealed, that May 20, 2009, was the last time Amanda visited J.D. The permanent custody motion was filed in late June of 2010, and the hearing was held in late September of 2010, both events being well over a year from Amanda's last visit. Thus, Amanda failed to visit or maintain contact with J.D. for more than ninety days, creating a presumption of abandonment which she did not rebut in any way. This finding,

-21-

alone, would mandate that the trial court find that J.D. could not be placed with Amanda within a reasonable time or should not be placed with her pursuant to R.C. 2151.414(E)(10).[6] Likewise, a finding of abandonment satisfies the requirements of R.C. 2151.414(B)(1)(b) without the need to find that J.D. could not or should not be placed with his parents.

{¶34} Lastly, the trial court also found that the parents were incarcerated with J.D.'s father due to receive a sentence of four to twenty years, according to his plea agreement, a copy of which was admitted by the Agency without objection as CPSU Exhibit 4, and Amanda serving a sentence that would not expire until March of 2014. Given the length of these sentences and the evidence that both parents were incarcerated at the time the motion for permanent custody was filed in June of 2010, the evidence also revealed that they would not be able to care for J.D. within eighteen months from the time of the filing of the motion for permanent custody, i.e. December of 2011. Thus, even if we were to conclude that the trial court erred in finding R.C. 2151.414(E)(1) applied, which we expressly do not conclude, the trial court did not err in finding that J.D. could not be placed with his parents within a reasonable time or should not be placed with his parents because R.C. 2151.414(E)(12) applied as well.

---

[6] The trial court also found, and the undisputed evidence revealed, that J.D.'s father last visited him on January 10, 2010, which would also render him abandoned by his father.

{¶35} Although we conclude that the trial court's decision regarding R.C. 2151.414(B)(1)(a) and (b) was not against the manifest weight of the evidence, before granting permanent custody of J.D. to the Agency, the trial court also had to find that permanent custody to the Agency was in J.D.'s best interest. Amanda contends in her second assignment of error, that the trial court erred in finding that permanent custody was in J.D.'s best interest because the court acted outside of its discretion in finding that Amanda's chances of judicial release "appear tenuous," that permanent custody would separate J.D. from his siblings, which is not in his best interest, and that the court's reliance on Amanda's addiction as a basis for determining J.D.'s best interests is misplaced because Amanda is conquering these addictions.

{¶36} In order to determine whether granting permanent custody to an agency is in a child's best interest, the trial court must consider *all* relevant factors, including, but not limited to, five enumerated factors. R.C. 2151.414(D). These enumerated factors are

> **(1)   The interaction and interrelationship of the child with the child's parent, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(2)   The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(3)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *;**

**(4)   The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and**

**(5)   Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

{¶37} The trial court specifically stated in its entry that it had considered all of these factors.  The court found that J.D. did not have a relationship with Amanda, that her lack of involvement with J.D. was primarily caused by her addiction, that she failed to maintain contact with her caseworker, and failed to visit J.D.  A review of the record reveals that these findings were amply supported.

{¶38} As previously discussed,  the undisputed evidence revealed that Amanda had not seen J.D. since he was approximately four months old and he was approximately twenty months old at the time of the hearing.  Further, Amanda's court hearing for which she did not appear was for a revocation of her community control because she tested positive for opiates, the substance to which she was addicted.  This resulted in the bench warrant being issued and her absconding from Ohio.  Rather than comply with the treatment recommendations of Century Health, Amanda chose not to attend more than half of her scheduled counseling sessions and fled to West Virginia.  Due to the outstanding warrant, she remained

-24-

in West Virginia until her arrest, which occurred after B.D. was severely injured, she provided a false name, and did not come forward with her real name until her mother talked to a minister and reported the truth of Amanda's identity to the authorities. At no point prior to her arrest did Amanda notify the Agency of her whereabouts or otherwise maintain contact with the Agency in order to monitor J.D.'s well-being. All of the evidence before the trial court indicated that Amanda's actions and/or inaction stemmed in one way or another from her addiction to opiates.

{¶39} The trial court also found that J.D. needed a legally secure permanent placement and that this type of placement could not be achieved without granting permanent custody to the Agency. This finding was supported by Lauck's testimony regarding J.D.'s need for a legally secure permanent placement and that his current foster family is interested in adopting him.

{¶40} In addition, the trial court considered J.D.'s wishes, which, due to his age, were expressed through his court-appointed special advocate/guardian ad litem ("CASA/GAL"), Chastity Miller. Miller prepared a report and recommendation for the trial court and also testified that the Agency should be granted permanent custody of J.D. Miller also stated that she was appointed as J.D.'s CASA/GAL when he was approximately one month old, that she has seen him in each of his placements, that she has seen "tremendous progress in his

current placements versus all the other ones," that he shows more signs of attachment to the current foster family, seems happier now, and his progress is much better in his current placement than in any of his past placements. (P.C. Hrg., 9/29/10, pp. 333-334.)

{¶41} The trial court also found that Amanda did not meet other goals of the case plan, including substance abuse and mental health counseling and establishing safe and stable housing. As previously discussed, other than the short amount of time that Amanda attended sessions at Century Health, the only evidence before the court that Amanda participated in any form of mental health and substance abuse counseling was Amanda's own testimony. Once again, in light of the number of fabrications that Amanda admittedly made, the trial court was well within its discretion as the fact-finder to disbelieve her testimony. Further, Amanda's reported homelessness in Toledo, her move to West Virginia where she lived with her husband who later severely injured their newborn baby, and subsequent incarceration amply demonstrated that she failed to establish safe and stable housing.

{¶42} Given the evidence before the trial court, we find that the trial court did not err in determining that granting permanent custody of J.D. to the Agency was in J.D.'s best interest. Although there was evidence that J.D. lived with his sister, maternal uncle and aunt, and his cousins for approximately four months,

had continued to visit with them once a week for approximately eight months, and one other time between March and September of 2010, the totality of the evidence supports the trial court's determination that permanent custody was in J.D.'s best interest. As noted by counsel for the Agency in closing arguments, "[J.D.] came into this world addicted. Since that time his parents have abandoned him, been sent to prison, failed to complete a case plan – among other things. [J.D.] has been lucky enough to be placed with a foster home where he's happy, getting along very well and he needs permanence in his life. He deserves it."

{¶43} For all of these reasons, we do not find that the trial court's granting of permanent custody was against the manifest weight of the evidence. Accordingly, the first and second assignments of error are overruled.

*Fourth Assignment of Error*

{¶44} Amanda asserts in her fourth assignment of error that the trial court erred by not granting her motion to continue the permanent custody hearing. The decision whether to grant a continuance is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *In re T.C.*, 140 Ohio App.3d 409, 747 N.E.2d 881, 2000-Ohio-1769. An abuse of discretion connotes more than a mere error in law or judgment; it implies an arbitrary, unreasonable, or unconscionable attitude on the part of the trial court. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶45} Juvenile Rule 23 provides that "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties." To determine whether the trial court has abused its discretion in denying a continuance, the appellate court must apply a balancing test considering all competing interests. *In re: T.C.,* supra.

> **In evaluating a motion for a continuance, a court should note inter alia: the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.**

*Id.* at 417, quoting *State v. Unger* (1981), 67 Ohio St.2d 65, 67-68, 423 N.E.2d 1078. While these factors provide basic guidance, we are mindful that "'[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" *Unger*, 67 Ohio St.2d at 67, 423 N.E.2d 1078, quoting *Ungar v. Sarafite* (1964), 376 U.S. 575, 589.

{¶46} When this case initially arose in February of 2009, Amanda and J.D.'s father were represented by the same attorney. On April 23, 2010, that attorney requested permission to withdraw from the case because of a conflict of

interests between Amanda and J.D.'s father. The trial court granted this motion, and Amanda was appointed a different attorney on May 5, 2010. On August 25, 2010, Amanda's new attorney requested permission to withdraw because of health issues he was experiencing. This request was granted, and Amanda was appointed new counsel on August 30, 2010. In the meantime, a "reasonable efforts hearing" had been scheduled for September 9, 2010, at 11:00 a.m. At 10:42 a.m., on September 9, 2010, Amanda's new attorney filed a motion to continue the permanent custody hearing, scheduled for September 28-30, 2010. In this motion, counsel stated that the continuance was being requested "to acquaint counsel with the facts of her case to effectively advocate for alternatives to Permanent Custody." (Mot. to Cont., 9/10/10.) However, counsel did not state how long of a continuance he would need to acquaint himself with the facts of the case. The reasonable efforts hearing was held as scheduled with Amanda's attorney attending, and after the hearing, the trial court filed its entry denying the motion to continue. This entry did not include an explanation of the trial court's decision.

**{¶47}** As previously noted, the permanent custody hearing occurred as scheduled on September 28-29, 2010. At the beginning of the hearing, the trial court asked if there were any preliminary matters before it began hearing evidence on the permanent custody motion. Counsel for the Agency proceeded to outline a number of stipulations, mostly involving exhibits. Amanda's attorney informed

the court that Amanda was in agreement with the stipulations outlined by the Agency, asked for an additional stipulation regarding a home study of J.D.'s paternal grandparents that was performed in Florida, and later clarified Amanda's position on the stipulation that J.D. was abandoned due to her incarceration. At no point did Amanda's attorney renew his motion for a continuance or otherwise indicate that he was not ready to proceed or that he was unprepared in some way. Counsel for Amanda cross-examined witnesses for the Agency during the hearing and presented two witnesses in Amanda's case-in-chief: Aaron Contreras and Amanda, herself.

{¶48} Upon review of the record, we do not find the trial court's decision to deny the continuance amounted to an abuse of discretion. Notably, counsel had nearly a month to prepare for the hearing and did not provide any indication in his motion of how much more time he would need to prepare. Moreover, counsel did not renew his motion for a continuance or otherwise indicate that he was not acquainted with the facts of the case or unprepared to advocate for alternatives to permanent custody. To the contrary, the record reveals that Amanda's counsel was well prepared and able to advocate for her position quite well. While ultimately he was not successful, this was not due to an ineffective performance on his part, and his preparedness was not an issue. Thus, Amanda has not shown that a continuance was necessary, which would warrant this Court concluding that the

trial court abused its discretion in denying this motion, or that she suffered any prejudice as a result of the court's denial of her request for a continuance. The fourth assignment of error is overruled.

{¶49} For all of these reasons, the judgment of the Common Pleas Court, Juvenile Division, of Hancock County, Ohio, is affirmed.

*Judgment Affirmed*

**ROGERS, P.J., and WILLAMOWSKI, J., concur.**