[Cite as *In re M.K.*, 2023-Ohio-97.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
| | : | Hon. Earle E. Wise, P.J. |
| M.K. | : | Hon. W. Scott Gwin, J. |
| | : | Hon. Craig R. Baldwin, J. |
| A.K. | : | |
| | : | |
| E.K. | : | Case Nos. 22CA000034 |
| | : | 22CA000035 |
| | : | 22CA000036 |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:  Appeal from the Guernsey County
Court of Common Pleas, Juvenile
Division, Case No. 20JC00255

JUDGMENT:  Affirmed

DATE OF JUDGMENT:  January 12, 2023

APPEARANCES:

For Plaintiff-Appellant W.K.                    For Defendant-Appellee GCCS

JEANETTE M. MOLL                              MELISSA WILSON
P.O. Box 461                                  1009 Steubenville Ave.
Zanesville, Ohio 43702                        Cambridge, Ohio 43725

For Guardian Ad Litem                         For CASA/GAL

RICHARD D. HIXSON                             CHERYL GADD
3808 James Court, Suite 2                     801 Wheeling Avenue
Zanesville, Ohio 43701                        Cambridge, Ohio 43725

*Baldwin, J.*

**{¶1}** Father, W.K., appeals the decision of the Guernsey County Common Pleas Court, Juvenile Division, granting appellee Guernsey County Children's Service's motion for permanent custody of her three children, M.K., E.K., and A.K.

## STATEMENT OF THE FACTS AND THE CASE

**{¶2}** Guernsey County Children's Services, (GCCS) began providing services to W.K. and his family in October 2018 after receiving allegations of child neglect and abuse. The family received assistance from the children's school, an organization called Creative Options, the Board of Developmental Disabilities and GCCS.

**{¶3}** Jenny Antill of the Guernsey County Board of Developmental Disabilities began working with the family in May 2019 assisting with their son, M.K.'s, behaviors and developing a plan to identify his needs and strengths. She observed that M.K. repeatedly attempted to run away, used extreme vulgar/sexualized language, was physically aggressive, acted out and destroyed property. At school he would attack people and other students, would attempt to bite them and acted out sexually. Though her focus was M.K., she was concerned about the behavior of W.K.'s daughter, E.K. E.K. stripped naked and ran around the house. She ripped the couch cushions and tried to eat the padding from inside the cushions. E.K. was so disruptive that Antill took a colleague to a visit to deflect E.K.'s physical attempts to intervene in her meeting with M.K.

**{¶4}** W.K. and the mother of the children, A.P., disclosed to Antill that they were not confident they could parent M.K. and deal with his behaviors. Antill arranged for services to come to the home and assist with M.K. and while W.K. and A.P. would accept recommendations, they did not consistently apply the information provided. Antill recalled

that "[w]e would make a suggestion and they would do it maybe for a week and then it just kind of fell off the charts." (Trial Transcript, p. 43, lines 4-6).

**{¶5}** During one visit, Mother mentioned to Antill that A.K. suffered seizures and Antill explained that A.K. may qualify for services if Mother would obtain a written diagnosis regarding the seizures, but Mother never provided the diagnosis.

**{¶6}** W.K. and A.P. executed a voluntary agreement of care with GCCS in July 2020, and the agreement was renewed twice. (Juv.R. 38(A)(1). Despite the services provided, the parents were unsuccessful in caring for the children. GCCS sought temporary custody and obtained an ex parte order on October 1, 2020 granting GCCS temporary custody. The trial court found the children dependent (Journal Entry, Dec. 15, 2020) and at the dispositional hearing ordered that they remain in the temporary custody of GCCS and approved the case plans for the parents. (Journal Entry, Jan. 11, 2021).

**{¶7}** The case plan included a requirement that W.K. complete a mental health assessment at the provider of his choice, a parenting assessment and that he follow any recommendations included in those assessments. He was asked to attend a parenting class to assist him with parenting his three children and he was obligated to demonstrate that he could provide a safe and stable home for the children. He was also asked to demonstrate that he could provide for the children's basic needs including nutrition, shelter, clothing, bedding, supervision, medical and educational needs.

**{¶8}** GCCS moved for permanent custody on September 15, 2021, but requested that motion be dismissed without prejudice in February 2022. A second motion for permanent custody was filed on February 25, 2022 and amended March 1, 2022. GCCS contended that the parents had failed to remedy the issues that resulted in the

children being removed from the home despite receiving services from a number of different agencies during the voluntary agreement of care and during the time the children were in temporary custody of GCCS. The motion also described each child's mental health status and their placement in residential treatment.

{¶9}    GCCS offered testimony regarding the diagnoses of each child as well at their behavioral issues at the hearing on the motion for permanent custody.

### The Children's Status

{¶10}  GCCS discovered that each child suffered serious mental health diagnoses and their behaviors made placement with foster parents untenable. They were first placed into a foster home as a group, but it soon became evident that M.K.'s behavior with his sister's required a separate placement. He was not only physically abusive to his foster parents, he was also acting-out sexually with his sisters, and frequently engaged in "humping" his sisters, an action imitating sexual intercourse. M.K.'s behaviors lead to an institutional placement where he was closely monitored and where he has had more success in controlling his inappropriate behavior.

{¶11}  The two girls, E.K. and A.K. were initially kept together, but their behaviors overwhelmed the ability of foster parents to provide care and supervision and they were separately placed in residential facilities that had the resources to manage their behavior and provide therapy.

### M.K.

{¶12}  Danielle Oddo, M.K.'s therapist, described his initial diagnosis as ADHD, oppositional defiant disorder, and unspecified mood disorder. He committed repeated sexually vulgar behaviors that led to his being restrained once or twice every day. He has

made improvement, but this eleven-year-old is still in a sexual aggressor's therapy group, aggressive replacement training group, and individual therapy and is taking three medications to address his behaviors. When M.K. is prepared to leave his current residential placement, Oddo recommended "a therapy to foster home, preferably one that's foster to adopt. Somebody that -- ideally a two-parent home that has experience with children transitioning out of residential services. If not, someone willing to work with us in therapy to allow the transition to be smooth." (Trial Transcript, p. 75, lines 1-6). She expected M.K. to need therapy for a period of time and an environment with a consistent schedule and regimen.

### E.K.

{¶13} M.K.'s sister, E.K., had mental health issues as well and was treated by Kristina Morgan beginning on June 13, 2022. E.K. came to Morgan with a diagnosis of post-traumatic disorder, attention-deficit/hyperactivity disorder, adjustment disorder, and disruptive mood dysregulation disorder. This seven-year-old girl receives two-and-a-half hours of mental health, day-treatment group each day and individual therapy twice a week. She meets with a psychiatric nurse practitioner at least once a month. She receives daily nursing services, and community supportive psychiatric treatment and is taking two medications.

{¶14} E.K. has made improvement, but it is limited. She too was transferred to a residential facility after unsuccessful placements in foster homes. Initially she was striking staff or peers every two hours, but now she can control her assaults for one-half of the day before she lashes out. She is now taking her medication instead of refusing them or spitting them out. Once she has sufficiently improved and can be released from residential

placement, she would need one-on-one care, structure and firm boundaries and further individual, family and group counseling.

## A.K.

{¶15} A.K., now ten years old, has also suffered significant problems. Her therapist, Jacqueline Witzberger, noted that she had poor attention span, difficulty staying on task, significant sleep issues and significant anxiety initially, then began exhibiting significant sexual acting-out behaviors and sexualized behaviors prior to the hearing on permanent custody. She had urinated on herself and in hallways. She defecated in the hallways and had eaten her own feces. She is stripping clothing off and engaging in sexual acts or mimicking sexual acts with other children.

{¶16} A.K. was diagnosed with ADHD, unspecified type; post-traumatic stress disorder; simple febrile convulsions; and behavioral insomnia of childhood, sleep onset, association type.

{¶17} A.K. has an Individualized Education Plan and receives speech therapy. She participates in CSPT (Community Supportive Psychiatric Treatment) groups that assist her with life skills and social development seven days a week. She participates in recreational therapy groups seven days a week and attends a psychotherapy group provided by a licensed professional counselor five days a week. She receives individual therapy at least twice a week and she sees a psychologist twice every month. At the time of the hearing she had been prescribed five medications to address mental health issues and her inability to sleep.

**{¶18}** A.K.'s progress has stalled as she deals with stages of grief and she is currently exhibiting anger at people in her family and "at where her life is now." Her therapist felt this was a typical occurrence in residential placement since "Residentials are facilities for the children who have had the most traumatic, darkest early childhood experiences. They can't function in the community safely. And so, they come in with a host of difficulties and struggles and issues. And they go through periods of time where you see them play out those behaviors, those situations, those events in their life." (Trial Transcript, p. 89, lines 17-24).

**{¶19}** Once A.K. is able to leave her residential placement, her therapist recommended intensive home-based services so that she has people that are in the home providing support to the family and to her, so she feels safe. A.K. will require continued psychiatric care for medication management and specialized education services.

**{¶20}** Each child has extensive needs that require the attention of several professionals and each is under constant close supervision. Each is progressing as expected in their separate residential placement, and the record shows that placement of the children together would not be safe and would interrupt their progress toward recovery.

### FATHER'S PROGRESS

**{¶21}** Father completed a mental health assessment with Dr. Aimee Thomas on July 8, 2020, prior to the children being taken into custody, and she diagnosed him as suffering from major depressive disorder recurrent severe, and unspecified personality

disorder. Dr. Thomas was not confident that he would be able to apply any parenting techniques he was taught as a result of the learning issues and functional illiteracy that her testing and interview disclosed. W.K. did concede that managing his children's behaviors was difficult and, when asked about his methods to address their behavior, he explained that he would "whip the children" and that he was advised by another county agency to "whip [his son's] butt in particular." (Thomas Deposition, p. 14, lines 19-21).

**{¶22}** W.K. had not obtained housing for his children by the hearing date and instead was saving money to put toward a new truck to replace his failing vehicle. At the time of the hearing he was living in his truck and had been working toward finding housing for his family, but altered his plan to focus on obtaining a camper.

**{¶23}** Father did complete a parenting program, but did not express a clear understanding of the breadth of the problems experienced by the children. He was unable to recall their birthdays and could not "verbalize" their diagnoses. He believed they were in GCCS custody because they were homeless. The facilitator of the class would only state that he "participated" and that he struggled with reading and writing.

**{¶24}** Father is still dealing with his diagnosis of depression and has only been able to "talk a little more openly and process the ongoing issues that are happening with the children being removed and how it's been affecting his functioning." (Trial Transcript, p. 233, lines 10-13).

**{¶25}** GCCS acknowledged that Father was cooperative and completed goals in the case plan, but contended that he was not prepared to assume responsibility for the children. The guardian ad litem and the Court Appointed Special Advocate for the children agreed that the parents were not capable of parenting the children.

{¶26} The guardian ad litem recommended that the children be placed in the permanent custody of the GCCS, focusing on the serious behavioral issues suffered by the children and the parents' apparent difficulty in applying rudimentary parenting techniques as a result of their own mental health issues. He noted that the behaviors of each child were challenging the skills of persons trained to counsel and treat troubled children and that the children were in facilities that provided constant supervision. The parents were struggling with their own mental health and could not provide the guidance and support that one child needed and would be overwhelmed by the task of caring for all three.

{¶27} The guardian ad litem also expressed concern that if the children were returned to the parents, the children's sexualized behaviors would not be controlled. He reported that Mother overestimated her ability to care for the children and placing them together would not be safe for the children and would exceed her ability to care for them.

{¶28} The Court Appointed Special Advocate (CASA) for the children came to the same conclusion. She recommended that the court grant permanent custody to GCCS because:

> * * each child is in treatment, residential treatment, their case plans all three outline trauma therapy due to posttraumatic stress. They have displayed sexualized behaviors. And they even -- in the beginning of this case the agency tried to put the girls together but had to split them up because of their sexualized behaviors and acting out. So to protect the children, they had to be split, the girls did. And they're each on medication that has to be given accordingly as ordered, not missed. By testimony we heard

yesterday, that even the father had to be taken off his medication because he would forget to take his meds. And these children must have their medication on time. It is part of their treatment regime.

Trial Transcript, p. 348, line 13 to p. 349, line 3

{¶29} She concluded that Mother lacked the ability to parent these high needs children due to her cognitive ability, her lack of insight into each child's medical diagnosis, mental health issues, and the children's need for medication, structure and consistency. She noted that the children need a structured environment that the parents cannot provide:

> In part, Mother, her heart's in the right place, but I don't believe she has the insight into what these needs are for her children. In her own words, she said, they just need love, I need to be kind, I need to pick my battles. Every day would be a battle. She forgets. And these children had issues when they came into care. [M.K.'s] doing better, but he's a long way to go. [E.K.] is just starting residential treatment and starting to cooperate a little bit. She still has good days, bad days. And [A.K.] is a child in crisis.

Trial Transcript, p. 349, lines 13-24

{¶30} She confirmed that neither parent appreciated the severity of the children's behaviors, and that, even with additional time, the children could not be reunited with their parents because once they complete residential treatment, they will need a therapeutic foster home to continue to address their needs. And she discounted the complaint that visitation had been stopped by observing that the children improved when visitation ended. M.K. still had phone contact, but it was brief and was usually ended by him.

**{¶31}** The CASA was also concerned by Mother's use of medical marijuana to self-medicate and feared it would impact her ability to parent. Mother was legally using medical marijuana under the supervision of a physician, but neither the physician nor any other expert testified as to its purpose. Mother asserted that the medical marijuana helped relieve the "blackouts" she claimed to have experienced, where her vision was interrupted for a period of time. She explained that they were not true blackouts, but acknowledged that her vision was affected and mentioned that an unidentified hospital recommended that she "get to neurology for it" but she had not seen a neurologist prior to the hearing. Aimee Thomas, a licensed psychologist who evaluated A.P. on June 22, 2022, affirmed the need for a neurological consult to resolve this issue.

**{¶32}** The trial court took the matter under advisement and issued a journal entry on August 24, 2022 granting the motion for permanent custody. After a thorough analysis of the testimony and evidence, the trial court concluded that:

> The Court finds that these children have been subjected to much trauma, neglect and abuse in their young lives. Father denies all wrong doing and mother has remained silent about this issue from the start. On the one hand, the parents admit they have problems addressing their children's behaviors. On the other hand, they don't accept responsibility for much of the trauma. Mother and Father have limited insight into their own mental health concerns. The Court does not believe, based on the testimony and evidence presented, that they truly understand the magnitude of the challenges their children face. The Court does not find the testimony of either parent to be credible as to how they got to this place or

how they plan to remedy the problems that resulted in the children being removed.

Journal Entry, August 24, 2022, p. 17

**{¶33}** The trial court also found that GCCS made reasonable efforts to finalize a permanency plan and to eliminate the continued removal of the children from the home and have attempted to make it possible for the children to return home, but the parents were unable to remedy the reasons leading to the removal of the children. The court found that it was in the best interest of the children that the parental rights of the Father and Mother were terminated and that permanent custody be granted to GCCS.

**{¶34}** The Father filed a timely appeal and submitted two assignments of error:

**{¶35}** "I. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILDREN BE SERVED BY THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE AS GCCS FAILED TO USE REASONABLE EFFORTS."

**{¶36}** "II. THE TRIAL COURT ERRED WHEN, DESPITE A CONFLICT BETWEEN THE CHILDREN'S WISHES AND THEIR ALLEGED BEST INTEREST, THE COURT FAILED TO APPOINT COUNSEL FOR THEM FOR THE PERMANENT CUSTODY HEARING THEREBY DEPRIVING THEM OF THEIR CONSITUTIONAL (SIC) RIGHTS."

**{¶37}** "III. THE TRIAL COURT ERRED WHEN, DESPITE A CONFLICT BETWEEN THE CHILDREN'S WISHES AND THEIR ALLEGED BEST INTEREST, THE COURT FAILED TO APPOINT COUNSEL FOR THEM FOR THE PERMANENT

CUSTODY HEARING THEREBY DEPRIVING THEM OF THEIR CONSITUTIONAL (SIC) RIGHTS."

## STANDARD OF REVIEW

{¶38} As to our standard of review, generally we review the trial court's decision in this context for abuse of discretion. We would examine the entire record and determine whether there is sufficient competent and credible evidence to support the judgment rendered by the trial court. *Seasons Coal Company v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1978). *Trickey v. Trickey,* 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952). The trial court must resolve disputed issues of fact and weigh the testimony and credibility of the witnesses. *Bechtol v. Bechtol,* 49 Ohio St.3d 21, 23, 550 N.E.2d 178 (1990). We would defer to the trial court's discretion because the trial court had the opportunity to observe the witnesses and parties in weighing the credibility of the proffered testimony in a way a reviewing court cannot.

## BURDEN OF PROOF

{¶39} "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169(1990), quoting *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551(1972). A parent's interest in the care, custody and management of his or her child is "fundamental." *Id.; Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599(1982). The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45(6th Dist. 1991). Therefore, parents "must be afforded every procedural and substantive protection the law allows." *Id.*

**{¶40}** An award of permanent custody must be based upon clear and convincing evidence. R.C. 2151.414(B)(1). The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23 (1986).

**{¶41}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

**{¶42}** Following the hearing, R.C. 2151.414(B)(1) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

(a)     The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as

described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

(b)    the child is abandoned;

(c)    the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d)    the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

**{¶43}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**I.**

**{¶44}** In his first assignment of error, the Father contends In his first assignment of error, the Father contends that the judgment of the trial court that the best interests of the minor children would be served by the granting of permanent custody was against the manifest weight and sufficiency of the evidence as GCCS failed to use reasonable efforts. He contends that "reasonable efforts requires more than handing a parent a list of services and then putting the entire responsibility on the parent to find and complete the service yet that is what happened here." (Appellant's Brief, p. 1). He concludes that termination of his visitation within the year prior to the permanent custody hearing interfered with his ability to reunify and that GCCS's referral to Goodwill Parenting in Canton to address the special needs of the children was not reasonable due to the prohibitive cost and the lack of transportation.

**{¶45}** Overall, Ohio's child welfare laws are designed to care for and protect children, "whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety." R.C. 2151.01(A). To that end, various sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit, including the requirement that the agency prepare and maintain a case plan with the goal to eliminate the need for the out-of-home placement so that the child can safely return home (R.C. 2151.412) and the burden on the agency to prove it made reasonable efforts to prevent the child's removal (R.C. 2151.419).

*{¶46}* The agency's duty to use reasonable efforts applies only to efforts to avoid removal of a child from their home or to reunify the child with the family following removal. *In re Warren*, 5th Dist. Stark No.2007CA00054, 2007-Ohio-5703. While the agency did

not have to show reasonable efforts at the permanent custody hearing, to the extent that the trial court relied on R.C. 2151.414(E)(1) at the permanent custody hearing, the court must examine the reasonable case planning and diligent efforts by the agency to assist the parents when considering whether the child cannot and should not be placed with the parent within a reasonable time. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 42. The issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case. *In re J.D.*, 3rd Dist. Hancock No. 5-10-34, 2011-Ohio-1458, ¶ 14. The child's health and safety is paramount in determining whether reasonable efforts were made. *In re R.P.,* 5th Dist. Tuscarawas No. 2011AP050024, 2011-Ohio-5378, ¶ 47.

{¶47} The Father's argument that GCCS failed to make reasonable efforts is undermined by his listing of the portions of the case plan he completed. The Father completed his mental health assessment, attended Mid-Ohio then Cedar Ridge for counseling, completed a parenting assessment and parenting class, was employed at Salt Fork Lodge and Conference Center, tested negative for illegal substances and signed all releases. The Father also completed an assessment with Mike Humphrey at Cedar Ridge regarding sexual assault and there were no recommendations for treatment. W.K. concluded that he "made substantial, consistent progress on his case plan objectives" but maintains that "the agency failed to utilize reasonable efforts, reasonable case planning, and diligent efforts" without a clear explanation of the argument supporting that conclusion or what actions he contends would be required to establish reasonable efforts.

**{¶48}** While he did complete requirements contained within the case plan, the Father did not obtain housing for himself or his children and was living in his vehicle. He was aware that his case plan required him to obtain housing, but he abandoned that goal and had planned to buy a newer vehicle, then sought help obtaining a camper. At the hearing on the motion for permanent custody the Father stated he was willing to obtain housing for the children if they were placed with him, but he was not interested in obtaining that housing without some guarantee that they would be returned to his custody. Some unidentified individuals told him that he would never be allows to have them again, and he concluded "To me, if I can't have a place -- I mean, my kids back, no sense making somebody else rich. I could get a camper and live in that." (Trial Transcript. p. 261, In 12-14). GCCS made reasonable efforts to assist W.K. in his effort to obtain housing, but he chose to place his own needs over the needs of his children.

**{¶49}** Father's suggestion that the reference to a prohibitively expensive parenting class prevents a finding that GCCS used reasonable efforts is not supported by the facts in the record. The program that was discussed at the hearing was described as a sixteen week program for multiple evenings each week. The testimony of Dr. Aimee Thomas regarding the parents' cognitive abilities and mental health issues in conjunction with the described behaviors of the children individually and as a group provided a reasonable basis for the trial court to conclude that parents would not be able to successfully apply what they learned and that they would once again be overwhelmed by the challenge of raising these children in one home. Dr. Thomas, speaking in the context of basic parenting class, stated that "[g]iven concerns with both [M.K.'s] learning issues, as well as [A.P.] issues, I had concerns that they would be able to recite information but not necessarily

apply it." (Thomas Deposition, p. 13, line 25 to p. 14, line 3). The trial court could reasonably conclude that the same concern would apply to a more intensive parenting program.

{¶50} Further, the representative from GCCS clarified that the motion for permanent custody was not filed because the parents did not complete the parenting class. (Trial Transcript, p. 182, lines 13-16).

{¶51} Consequently, the trial court's finding that reasonable efforts were made is not undermined by the failure to finance the parent's participation in a program that Dr. Thomas contended the parents may not be able to apply.

*{¶52}* We also find that the termination of visitation does not have any impact on the finding of reasonable efforts. First, the Father provides only a conclusion that it interfered with reunification, but no argument to support his conclusion. GCCS halted visitation and noted that the behavior of the children improved. On February 28, 2022 Father filed a motion requesting the trial court order visitation, noting that he last visited M.K. and E.K. in August 2021. The trial court found "[n]either the Agency, the CASA nor the GAL would recommend any visitation with the parents and the children based upon the current situation. Clearly, these children have many problems as the result of the parenting, or the lack of parenting of the Mother and Father. The best interests of the children dictate that there be no visitation with the children until further order of this court." (Journal Entry, July 1, 2022, p. 3). The children's health and safety are the paramount concern when evaluating reasonable efforts and the trial court's ruling is consistent with that requirement. *In re R.P., supra.*

**{¶53}** We have reviewed the entire record and find that the trial court did not abuse its discretion in finding that agency's case planning and efforts were reasonable and diligent under the circumstances of the case and the best interests of the children would be served by granting permanent custody. The parents took advantage of the services and recommendations of GCCS, but the underlying problems that led to the removal of the children from the home nevertheless were not resolved.

**{¶54}** The first assignment of error is denied.

**II.**

**{¶55}** The Father combines the second assignment of error with the first and the delineation between the argument is not as clear as it might be. The stated assignment of error is " There was not clear and convincing evidence for the trial court to find that the minor children should not be placed with appellant and that it was in the minor children's best interest to be placed in the permanent custody of Guernsey County Children's Services" but we interpret his brief as arguing that he made substantial consistent progress on his case plan and, therefore, the court could not conclude that the children could not be placed with their parents within a reasonable time. As to the best interest, the Father argues that that trial court failed to adequately consider the wishes of the children and failed to appoint legal counsel for the children.

**{¶56}** The record shows that the children were taken into the custody of GCCS on October 1, 2020, adjudicated dependent December 15, 2020 and remained in the custody of GCCS until February 25, 2022, the day the motion for permanent custody was filed, so the children have "been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a

consecutive twenty-two-month period * * *." R.C. 2151.414(B)(1)(d). The trial court also found that the children could not be placed with the either of the child's parents within a reasonable time, and that finding is supported by the record. The CASA offered unrebutted testimony that the children could not be reunified with the parents if they were given additional time, and the evidence of the mental health issues that afflict each family member supports that conclusion. Consequently, we find that the trial court did not err when it found that the children cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶57} The trial court moved to an analysis of the best interest of the children, referring to the elements described in 2151.414(D)(1)(a)-(e). The trial court completed a thorough analysis of the facts supporting its conclusion for each of the elements listed in 2151.414(D)(1) and concluded that the children needed a legally secure placement that could not be achieved without a grant of permanent custody to the agency. The trial court provided a succinct analysis of its findings in a concluding paragraph:

> The Court finds that GCCS has made diligent and reasonable efforts to finalize a permanency plan for M.K., A.K. and E.K. by providing referrals for service, exploring kinship, case management, and exploring permanency planning. GCCS has made reasonable efforts to eliminate the continued removal of the minor children and have attempted to make it possible for the children to return home to the mother and/or father. The parents have been unable to remedy the reasons for the children being removed in the first place. GCCS has established a safe, stable and secure environment for M.K., A.K., and E.K.

Journal Entry, Aug. 24, 2022, p. 16

**{¶58}** The trial court did not err in finding that the record contains clear and convincing evidence that the best interest of the children will be served by granting permanent custody to GCCS and that permanent custody was supported by the facts in the record.

**{¶59}** The Father's second assignment of error is denied.

III.

**{¶60}** In his third assignment of error, the Father contends that the trial court erred by not appointing counsel for the children because there was a conflict between the children's wishes and their best interest as promoted by the guardian ad litem.

**{¶61}** Father combed through the reports of the guardian ad litem and the Court Appointed Special Advocate and isolated statements that he concludes show a need for the appointment of counsel for the children. First, we note that the Father did not press this issue before the trial court so that the matter could have been fully developed at that juncture, raising the question of whether his argument has been waived. Under the circumstances, we have determined that we should consider the merits in the interest of justice. Further, the trial court did review that issue in considering the children's best interest and concluded that "[t]he wishes of the children were set forth in the GAL report. M.K. does not wish to return to his mother or father and A.K., and E.K. could not form a reliable statement regarding their wishes." (Journal Entry, Aug. 24, 2022, p. 14).

**{¶62}** The Father selects portions of the GAL and CASA report to support his contention that a conflict of interest existed, but any conflict vanishes when the quote is viewed in its entirety. The GAL's analysis of the wishes of the children makes reference

to A.K.'s comment regarding returning home to her parents, but that quote is qualified by the accompanying text:

> Neither A.K. nor E.K. were able to form a reliable statement regarding their wishes. A.K., although stating at one point that she would like to return with her parents, was not consistent nor firm in her statement of wanting to return to live with either parent. A.K. also stated at various points that she would like to live with CW Tacy Bates, CASA Cheryl Gadd, or myself, despite having just met her at the time.

> E.K., as the youngest of the three, had the most trouble communicating her wishes. She was seemingly unable to focus on the conversation at hand for more than a few seconds at a time (a problem that seemed to affect all three children), We played "Pirates" during our conversation, a game that involved hiding "treasure" around the room and finding it. During our game, she indicated that she loved her siblings, but if she could choose anywhere, would prefer to return to "Debbie", a prior foster caregiver's home.

Guardian ad litem, Report, July 29, 2022, p. 5.

**{¶63}** The complete quote from the CASA report reflects A.K. did not have a clear desire to live with her parents:

> In asking C-A.K.'s wishes after she completes the program at Fox Run C-A.K. told the group she wants to live with GCCS T. Bates for 10 days with her mommy and daddy there too. Then move to CASA Ms. Cheryl's house and finally stay with Atty. GAL Danny for one day then move back

with mommy and daddy at the apartment. Clearly C-A.K.'s answer to the wishes for placement after completion of Fox Run proves her lack of understanding of her circumstance.

CASA Report, July 25, 2022, p. 8.

**{¶64}** E.K. expressed a desire to "go back to mom and dad" but the complete quote makes it clear she was not referring to her biological parents:

> CASA did ask C-E.K. what her wishes are once she completes the program at Heritage Hannah Neil. C-E.K. told CASA she wants to go back to mom and dad. CASA knows she also calls Brent and Taysha mom and dad. CASA asked which mom and dad she stated Taysha.

CASA Report, July 25, 2022, p. 9.

**{¶65}** This case differs from *In re H.R.*, 2nd Dist. Montgomery No. 21274, 2006-Ohio-1595, ¶ 8, a case cited by Father, where a ten year old clearly expressed her desire to be adopted and her wish to continue to visit her biological father. That case did not indicate that the ten year old suffered severe mental health issues or that she had any problem expressing her desires. The guardian ad litem in that case reported the desires of the child and the Father filed a motion requesting appointment of separate counsel, another distinguishing feature of the case. As noted above, W.K. did not bring this matter to the attention of the trial court and did not move for the appointment of separate counsel.

**{¶66}** And this is not a case where the juvenile has consistently and repeatedly expressed a desire to be with a parent. *In re Williams,* 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110, ¶¶ 5-6. Instead, the children in this case who have established mental health diagnoses and behavioral problems have responded to questions in such

a way that it is clear that they have not yet sufficient maturity and intellect to understand their circumstances. The trial court has noted the severe trauma suffered by the children and found that they "could not form a reliable statement regarding their wishes" and the record supports that finding.

**{¶67}** Finally, any attorney appointed to represent the children would not be any more successful in determining whether these children could express a consistent and coherent desire to live with their parent or another person. A.K. told her therapist "I think I need a new mom and dad. My mommy and daddy taught me how to do this. Do you think that me and Sissy can go live with Grandma or my aunt? Do you think somebody here can adopt me? Do you think me and Sissy can be in a home together?" (Trial Transcript, p. 107, lines 10-15). E.K. "wants to know when she can go back to Taysha's. C-E.K. Refers to the last foster parents as 'my mom and dad' " so an appointed attorney would face an insurmountable challenge interpreting the wishes of these children. (CASA Report, July 25, 2022, p. 9)

**{¶68}** We find that the comments made by the children do not present a conflict of interest for the guardian ad litem. Instead we find that these comments are the consequence of the immaturity, mental health issues and trauma suffered by the children and cannot be interpreted as a consistent or repeated desire for a result that conflicts with the guardian ad litem's recommendation regarding the children's best interest.

**{¶69}** The third assignment of error is denied.

{¶70} The August 24, 2022 decision of the Guernsey County Court of Common Pleas, Juvenile Division is affirmed.

By: Baldwin, J.

Wise, Earle, P.J. and

Gwin, J. concur.